**In re EAGLE–PICHER INDUSTRIES, INC., et al., Debtors.**

**OFFICIAL COMMITTEE OF INJURY CLAIMANTS, Movant,**

v.

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Respondent.**

**FUTURE CLAIMS REPRESENTATIVE, Movant,**

v.

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Respondent.**

**Bankruptcy No. 1–90–00100.**

United States Bankruptcy Court, S.D. Ohio, Western Division.

June 22, 1994.

James A. Ralston, General Counsel, Eagle–Picher Industries, Inc., Cincinnati, OH, Stephen Karotkin, Weil, Gotshal & Manges, New York City, and Edmund J. Adams, Frost & Jacobs, Cincinnati, OH, for debtors Eagle–Picher Industries, Inc., et al.

Neal J. Weill, Office of U.S. Trustee, Cincinnati, OH.

Carolyn J. Buller, G. Christopher Meyer, Squire, Sanders & Dempsey, Cleveland, OH, for Unsecured Creditors' Committee.

Kevin E. Irwin, Robert G. Sanker, Michael L. Scheier, Keating, Muething & Klekamp, Cincinnati, OH, for Injury Claimants' Committee.

Claude D. Montgomery, Marcus Montgomery Wolfson & Burten P.C., New York City, and Irving Harris, Harris, Harris & Field, Cincinnati, OH, for Equity Sec. Holders' Committee.

James McMonagle, Chagrin Falls, OH, Robert Balantzow, McCarthy, Lebit, Crystal & Haiman Co., L.P.A., Cleveland, OH, for Future Claimants Representative.

William T. Hayden, Cohen, Todd, Kite & Stanford, Cincinnati, OH, for co-defendants of the debtors.

Michael A. Berman, Office of General Counsel, SEC, Washington, DC.

Daniel M. Katlein, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, MI, for NBD Bank, N.A.

## ORDER ON MOTIONS FOR STAY OF PERSONAL INJURY CLAIMS PROCEEDINGS BY UNSECURED CREDITORS' COMMITTEE

BURTON PERLMAN, Chief Judge.

The Official Committee of Unsecured Creditors ("UCC") in these consolidated Chapter 11 bankruptcy cases has filed objections to 100 proofs of claim filed by asbestos claimants and proposes to conduct discovery in each of the contested matters so initiated. The Official Committee of Injury Claimants ("ICC") and also the Future Claims Representative ("FCR") have filed motions to stay such discovery. Debtors support the motions. The ICC and the Official Equity Security Holders' Committee ("Equity Committee") oppose the motions.

It is important to take note of where these bankruptcy cases are. By order of this court on June 5, 1992, a mediator was appointed whose mission it was to assist the several constituencies in play in these cases toward a consensual plan of reorganization. All of the constituencies expressed agreement to participating in that effort. The order appointing the mediator conferred upon him the power to "control the procedural aspects of the mediation," including the power to "decide when to hold joint and/or separate meetings with the parties." The order also stated that the mediator could advise the court about the process, "but not about the substance of the discussions" involved in the mediation.

The subject of negotiation and mediation arose at the conclusion of a hearing which essentially pitted the debtors against the ICC and the Equity Committee. That hearing (the "process hearing") had to do with decision about a process to be followed in determining the value of asbestos claims. Considerable evidence was introduced at the process hearing. At its conclusion, the UCC suggested that the court, rather than deciding the issue which was the subject of the hearing, should permit the parties to engage in negotiation. While the UCC was an interested observer in the subject of that hearing, it did not play a role. The participants were rather the debtors, and principally opposed to the debtors was the ICC. Upon the expression by the constituencies involved that negotiation might be fruitful, the court deferred decision on the matter which had been litigated at the hearing. The court subsequently, as we have said, with the agreement of the parties, installed a mediator to facilitate the process.

It was the decision of the mediator to proceed first to explore the possibilities of reaching agreement between the parties which had been fiercely locked in litigation at the process hearing, that is, the debtors, the ICC, and the FCR. After an extended period of time, those efforts were successful. The Chapter 11 debtors at that time, November 10, 1993, issued a News Release announcing Agreement on Principal Elements of Joint Plan of Reorganization with Major Parties in Its Chapter 11 Case. That Release stated that a claims administration trust was to be created to which present and future asbestos claims would be channeled. It stated further that Eagle–Picher Industries would record an increased reserve for asbestos liabilities of $1.1 billion. The Release stated also that the debtors, ICC and FCR would negotiate with the UCC and the Equity Committee, but if a consensual plan did not emerge, a plan would be filed giving the UCC constituency a 30% distribution, with nothing for equity. The Release made no reference to any other provision of the agreement between the debtors, the ICC and FCR. (That agreement had been embodied in a document identified as the "Term Sheet.")

Upon reaching agreement among the then major adversaries, the mediator then involved the UCC and the Equity Committee in further negotiations in an effort to reach a consensual plan with all parties. Those efforts thus far have not been productive.

Further background relevant to the present motion is the following. On August 28, 1992, this court entered an order upon the motion of debtors to extend the exclusivity period during which only the debtors might file a plan of reorganization. The motion was granted. The order granting the motions stated that it was:

ORDERED that pursuant to section 1121(d) of the Bankruptcy Code (i) the 120–day period specified in section 1121(b) of the Bankruptcy Code be, and it hereby is, further extended to 60 days from and after the date on which the Court receives a written statement (the "Statement") from Mr. Jerry Lawson [the court-appointed mediator] advising the Court that the mediation directed by Order of the Court dated June 5, 1992 has reached an impasse; and (ii) the 180–day period specified in section 1121(c)(3) of the Bankruptcy Code be, and it hereby is, further extended to 60 days from and after the extension specified in the immediately preceding clause (i);

\* \* \* \* \* \*

It is also necessary to make reference to another controversy which arose earlier in these cases. At issue was the question of whether a bar date for the filing of present asbestos claims should be set, present asbestos claims referring to those where it was asserted that an asbestos medical condition caused by debtors' products existed. The initiative to do so was begun by debtors, while the ICC opposed setting such a bar date. This court resolved the issue in favor of debtors and a bar date was set accompanied by a widespread notice program. By the bar date, some 160,000 claims were filed. (It should be remembered that further claims subsequent to the bar date are expected to arise, and it is such anticipated claims which are the bailiwick of the FCR.)

Consideration of the issue presented at the process hearing was suspended when the parties undertook negotiation, and remains so. The positions of the respective parties should, however, be noted. The ICC was contending that an estimation of asbestos liability could be made based upon existing information. Debtors contended to the contrary that further information was necessary before an estimation could be made. We are not here going to resolve that controversy. We make reference to it because it was clear that if debtors prevailed, a sampling process, devised by professionals whose business it was to create a suitable program, would be employed. This court believes and holds that only through such a sampling program can useful data be collected for purposes of estimation, where the total number of claims is of the magnitude in these cases.

The ICC and the FCR in their present motions seek to prevent the conducting by the UCC of quite a different kind of program. The UCC has initiated 100 contested matters in this court, objecting to the proofs of claim of 100 asbestos claimants. Moreover, the UCC has asked debtors to identify an additional 1,000 claims to which it also intends to file objections. We were informed at the hearing on the present motions that what the UCC requested from debtors in regard to each of the lists, was simply a list, and that is what debtors provided. The requests were not qualified in any way, as would be the case if some sampling system were being employed, nor does the UCC say that some professional person other than counsel was involved in the effort which was being undertaken.

We made it clear at the hearing that we wished to know the purpose for which the UCC was undertaking the present initiative of contesting asbestos claims. We were informed that the purpose was in order to estimate claims. This court believes and holds that initiating 100 contested matters objecting to claims selected on no systematic basis, or doing so for 1,000 claims, or 5,000 claims, where there are 160,000 claims on file, is not calculated to produce valid information for use in the estimation of the value of asbestos claims. The present motions are therefore well taken.

The UCC argues that it has an absolute right to follow the course which it has chosen, for § 502(a) of the Bankruptcy Code gives it the right to object to claims. It contends further that this court does not have the power to deny it the right to pursue those objections. We disagree. It is not necessary to look further than § 105(a):

(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action

or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

\*    \*    \*    \*    \*    \*

This court regards the discovery proposed to be an abuse of process because it cannot produce information useful in estimation.[1] This court finds further support for its action in granting the relief to movants which they seek, in our duty to oversee the bankruptcy estate and to prevent its waste. *See* 28 U.S.C. § 1334(d).

Accordingly, the motions of the Injury Claimants Committee and of the Future Claims Representative are granted. The Unsecured Creditors' Committee is stayed from any further proceedings in furtherance of personal injury claims objections.

So Ordered.

---

1. This court is aware that the phrase "abuse of process" in § 105(a) is not defined in the Bankruptcy Code. We find the following helpful:

> The few reported cases on its meaning in § 105(a) essentially define it as "maneuvers or schemes which would have the effect of undermining the integrity of the bankruptcy system," [FN 116] but fail to clarify the circumstances which constitute such abuse. "Abuse of process" is a term of art in nonbankruptcy contexts referring to a species of tort. Under nonbankruptcy law, abuse of process is a misuse of properly issued judicial process. [footnote omitted.] This tort definition is not broad enough for purposes of § 105(a), because certain actions could have the effect of undermin-

> ing the integrity of the bankruptcy system without constituting the tort of abuse of process.
> [116] *In re Calder*, 93 B.R. 739, 740 (Bankr. D.Utah 1988). *See also In re Burrell*, 148 B.R. 820, 824 (Bankr.E.D.Va.1992) (characterizing abuse of process as a situation where "[i]naction by the court ... would undermine the integrity of the bankruptcy system").

Hon. Stephen A. Stripp, *An Analysis of the Role of the Bankruptcy Judge and the Use of Judicial Time*, 23 Seton Hall L.Rev. 1329, 1364–65 (1993).

The lodging in the court of a large number of pointless controversies clearly is calculated to undermine the integrity of the bankruptcy system generally, and to be detrimental to those cases specifically. Such filings we hold to be abusive.